# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| **MARY C. MANNING,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case number 1:05cv0058 TCM** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Jo Anne B.
Barnhart, the Commissioner of Social Security ("Commissioner"), denying the application
of Mary C. Manning for disability insurance benefits ("DIB") under Title II of the Social
Security Act ("the Act"), 42 U.S.C. §§ 401-433, is before the Court[1] for a final disposition.
Ms. Manning has filed a brief in support of her complaint; the Commissioner has filed a brief
in support of her answer.

### Procedural History

Mary Manning ("Plaintiff") applied for DIB in November 2002, alleging she had been
disabled since July 27, 2001, as a result of diabetes, neuropathy, hernias, carpal tunnel

---

[1]The case is before the undersigned United States Magistrate Judge by written consent of the
parties. See 28 U.S.C. § 636(c).

syndrome, and depression.  (R. at 58-60.)[2]  Her application was denied initially and after a

hearing held in June 2004 before Administrative Law Judge ("ALJ") Sandra K. Rogers.[3]  (Id.

at 18-24, 39, 46-49, 58-60, 580-604.)  The Appeals Council denied Plaintiff's request for

review, effectively adopting the ALJ's decision as the final decision of the Commissioner.

(Id. at 6-8.)

## Testimony Before the ALJ

Plaintiff, represented by a lay person,[4] and Jeffrey F. Magrowski, Ph.D., testified at

the administrative hearing.

Plaintiff testified she was 49 years' old and lived with her husband of 31 years'.  (Id.

at 582, 602.)  She was 5 feet 2¼ inches tall and weighed approximately 250 pounds.  (Id. at

583.)  She had recently gained 25 pounds and attributed the increase to the pressure of

selling their house.  (Id. at 583-84.)  She smoked, but was trying to stop.  (Id. at 584.)  She

had decreased the amount she smoked from one and one-half packs of cigarettes a day to

one-half pack.  (Id.)  She did not drink alcohol.  (Id.)

Plaintiff had an associates degree from junior college, with a joint major in criminal

justice and education.  (Id.)  She last worked on July 26, 2001.  (Id.)

---

[2]References to "R." are to the administrative record filed by the Commissioner with her
answer.

[3]An earlier DIB application alleging a disability onset date of July 26, 2001, was denied in
June 2002; the denial was not appealed.  (Id. at 40-43, 55-57.)

[4]The hearing transcript refers to the representative as an attorney.  He indicated, however,
on an appointment form that he was not one.  (Id. at 44.)

Plaintiff testified that she could not work because her nerves could not "handle it." (Id. at 587.)  Her psychiatrist has told her she has severe recurrent depression syndrome. (Id.)  The daily symptoms of her depression include wanting to sleep a lot and not wanting to be around people.  (Id. at 588.)  She sometimes contemplates suicide and thinks she's a burden on her family.  (Id.)  Medication, Lexapro, helps.  (Id.)  Trazodone helps her sleep. (Id. at 589.)

Plaintiff has had diabetes for five or six years and has been on insulin since her diagnosis.  (Id. at 589.)  She also has bone spurs in her feet, knees, and hips.  (Id. at 590.) Occasionally the pain wakes her up at night.  (Id.)  She takes Lasix for the swelling in her hands and legs; it helps.  (Id.)

Plaintiff has had carpal tunnel surgery.  (Id.)  She continues, however, to have pain in her hands and occasional numbness in two fingers in her right hand.  (Id. at 590-91.)  Her little finger stays bent.  (Id. at 591.)  She has three hernias and open sores in her abdomen. (Id. at 596, 597.)

Plaintiff cannot lift anything heavy and sometimes drops things as light as glasses. (Id. at 591.)  She cannot walk or stand in one place for longer than 10 or 15 minutes.  (Id. at 591-92.)  She cannot sit anywhere comfortably, nor does she sleep well.  (Id. at 592.)  She has a crying spell two or three times a week.  (Id. at 593.)

Plaintiff leaves her house two or three times a week.  (Id. at 594.)  Her daughter Becky or her husband usually drives.  (Id.)  Her daughters help her with chores.  (Id. at 595.) She now lives in a mobile home and no longer has to go up and down stairs.  (Id.)  Her

children help her do her grocery shopping. (Id.) She does not do any yard work. (Id.) She sometimes uses an assistive device for walking. (Id. at 596.) Because she has trouble getting dressed, she tries to wear loose-fitting clothes. (Id.) She can bathe herself because her tub has a seat. (Id. at 597.) The surgery on her hands and the numbness make it difficult for her to play the guitar, something she has done since she was nine years' old. (Id. at 598.)

Dr. Magrowski, testifying as a vocational expert, characterized Plaintiff's past relevant work as a juvenile detention aide as light and at least semiskilled. (Id. at 599.) Her work as a real estate salesperson and as a substitute teacher were both light and skilled. (Id.) Her work at a shoe factory was light and unskilled. (Id.) As Plaintiff described her specific job as a juvenile detention aide, it was heavy and skilled. (Id. at 600.) Some of the skills she used in that job and as a salesperson would be transferable. (Id.) A claimant with the restrictions listed on Exhibit 13F, a diabetes questionnaire, would not be able to do any jobs. (Id. at 601.) Someone with a Global Assessment of Functioning ("GAF")[5] score of 60[6] of Plaintiff's age and with her experience and education would be able to perform jobs existing

---

[5]"According to the Diagnostic and Statistical Manual of Mental Disorders 32 (4th Text Rev. 2000), the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning.'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n. 2 (8th Cir. 2003). See also **Bridges v. Massanari**, 2001 WL 883218, *5 n.1 (E.D. La. July 30, 2001) ("The GAF orders the evaluating physician to consider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." (interim quotations omitted)).

[6]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Diagnostic and Statistical Manual of Mental Disorders at 34 (alteration added).

in the national or regional economy, for instance, packing or stuffing jobs and some assembly or fabricating jobs.  (<u>Id.</u> at 602.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to that application, records from various health care providers, completed questionnaires submitted by her attorney, and evaluation reports and.

When applying for DIB, Plaintiff reported that her impairments first started bothering her in August 1997 and stopped her from working on July 26, 2001, when abdominal spasms were causing her to lose consciousness.  (<u>Id.</u> at 106.)  Her primary care physician was Dr. Christopher Maret.  (<u>Id.</u> at 108.)  She consulted Dr. Raziya Mallya and Lynn James, L.P.C., for depression.  (<u>Id.</u> at 108-09.)  She explained in a claimant questionnaire that everyday movements, e.g., walking or moving about, caused her muscle spasms and using her hands and arms made them hurt and become numb.  (<u>Id.</u> at 129.)  She was concerned, however, if she did not keep moving she would lose all mobility.  (<u>Id.</u>)  Sitting in a whirlpool spa helps relieve her pain.  (<u>Id.</u>)  Her medications include Celexa, Nortriptyline, Enalapril, and Naproxen.  (<u>Id.</u> at 130.)  Because of her impairments, she cannot play music like she used to and has difficulty doing housework and laundry.  (<u>Id.</u> at 131.)  She gets up frequently at night and wakes up tired.  (<u>Id.</u>)  She has lost interest in her appearance.  (<u>Id.</u>)  The meals she prepares are "quick and easy."  (<u>Id.</u>)  Also, she gets confused and has to have directions

repeated.  (Id.)  Pain has become a constant presence in her life.  (Id. at 134.)  She goes to counseling for her depression but finds it easy to say what is expected of her.  (Id. at 139.)

Two of Plaintiff's daughters, her son, and her husband wrote letters supporting and amplifying her complaints.  (Id. at 147-65.)  One daughter wrote that the numbness in Plaintiff's hands became better after her carpal tunnel surgery but she still had very little grip.  (Id. at 150.)  Doctors have told her mother that they cannot operate on the hernias in her stomach because the operation would kill her.  (Id. at 152.)  Another daughter wrote that her mother had had complications with her health since the daughter was young.  (Id. at 154.)  Her mother walked with a limp.  (Id.)  Her husband noticed "dramatic changes" in Plaintiff's health about six years before.  (Id. at 158.)  Specifically, her eyesight became worse, her appetite changed, and her fatigue and confusion both increased.  (Id.)  "She had the shakes[.]"  (Id.)

Plaintiff's medical records before the ALJ begin with the treatment notes of Rakesh Shishodia, M.D.

Plaintiff first consulted Dr. Shishodia on March 3, 1999.  (Id. at 329-33.)  She reported that she had a one and one-half year history of diabetes, a twelve-year history of hypertension, and a transient ischemic attack ("TIA") three to four years ago.  (Id. at 329.)  She was taking 425 milligrams twice a day of Glucophage for the diabetes and was doing well on the medications for her hypertension.  (Id.)  She was concerned, however, about a medication she had been taking for possible pedal edema.  (Id.)  She had been a smoker for 25 years.  (Id.)  She was on a diabetic diet and was losing weight; she currently weighed 218

pounds. (Id. at 329-30.) Dr. Shishodia asked that she decrease the dosage of Glucophage to 250 milligrams twice a day, follow a 2,000 calorie diet, continue to exercise, and monitor her symptoms of pedal edema. (Id. at 331.) He prescribed an antibiotic for her bronchitis. (Id.) He informed her that it might be possible to discontinue the Glucophage entirely if she lost enough weight. (Id. at 331.)

Two days later, Plaintiff returned to Dr. Shishodia. (Id. at 325-26.) She did not feel any better, was unable to breathe well, and was coughing a lot. (Id. at 325.) A chest x-ray showed bronchitis but no pneumonia. (Id. at 326-27.) She was prescribed a course of antibiotics and told not to work that day or the next. (Id. at 326-28.)

On April 7, Plaintiff informed Dr. Shishodia that she had generalized swelling after stopping the medication for her edema. (Id. at 322-23.) She also had a fungal infection in her toenails. (Id.) She weighed 225 pounds. (Id. at 322.) She was started again on the medication for her edema and was told to take the Glucophage only once a day. (Id. at 323.)

After Plaintiff consulted Dr. Shishodia on June 16 about severe coughing, stuffiness in her nose and sinuses, and a headache of one-week duration, he scheduled her for a computerized topography ("CT") scan of her head and sinuses. (Id. at 312-13.) The CT scan revealed calcified falx cerebri in her frontal region and a fibrous septum in her left maxillary sinus. (Id. at 311.) When the results were given to Plaintiff on June 23, she reported that her headaches were gone but the cough was not. (Id. at 310-11.)

Pursuant to a referral by Dr. Shishodia, Plaintiff consulted Alan B. Silverberg, M.D., a professor of internal medicine at St. Louis University ("SLU") on June 29. (Id. at 182,

184.)  Plaintiff reported that she had been told she was borderline diabetic for 20 years but had never had any treatment.  (Id. at 184.)  She had been diagnosed with diabetes mellitus two years ago.  (Id.)  Her current regimen of Glucophage caused erratic high and lows.  (Id.)  She followed a dietician-recommended diet.  (Id.)  On examination, she had extensive striae on her abdomen.  (Id. at 185.)  Her Romberg sign was negative.[7]  (Id.)  Her gait and strength were within normal limits.  (Id. at 187.)  She had never had an opthamology examination.  (Id. at 184, 186.)  Her impairments were diabetes mellitus, obesity, and "smoker."  (Id. at 187.)  She was to be referred to a diabetes nurse educator and return afterwards, be given a new glucose monitor, do the self-monitoring twice a day and fax the physician the results every two or three weeks, have certain laboratory tests, and have an annual dilated ophthalmology examination.  (Id. at 182, 187-88.)

Plaintiff again consulted Dr. Shishodia on July 19 about her sinus problems.  (Id. at 308-09.)  A course of antibiotics was prescribed.  (Id. at 309.)  She was released to return to work on July 22.  (Id. at 183.)

On August 1, Plaintiff went to the Madison Medical Center emergency room complaining of increased blood sugar levels and lethargy.  (Id. at 303-06.)  Also, the vision in her right eye was blurry, her right leg hurt, and her right side was tingling.  (Id. at 306.)  She was given insulin intravenously, which resolved the tingling and made her feel better.  (Id.)  The next day, Plaintiff saw Dr. Shishodia.  (Id. at 295, 301-02.)  She reported that her

---

[7]A Romberg's test is the ability to stand with feet together and eyes closed.  Merck Manual, 1384 (16th ed. 1992).  A negative test reflects an ability to do so.

blood sugar levels had ranged between 43 and 300[8] and that she had been trying to maintain a diabetic diet. (<u>Id.</u> at 301.) She wanted her blood pressure medication changed. (<u>Id.</u>) She had no headaches and no earaches. (<u>Id.</u>) She was to continue taking the Glucophage as prescribed and to start using insulin on a sliding scale. (<u>Id.</u> at 302.) Also, she was to follow up with Dr. Silverberg. (<u>Id.</u>) On August 23, Dr. Silverberg recommended that Plaintiff stop smoking, increase her exercise, decrease her weight, consult a dietician, and follow-up as needed. (<u>Id.</u> at 299.)

On September 1, Plaintiff reported to Dr. Shishodia that her blood sugar levels were better. (<u>Id.</u> at 293-95.) She had been taking her medication, including insulin and blood pressure medication, as directed. (<u>Id.</u> at 293.) She had not lost any weight and was not crying or gloomy. (<u>Id.</u>) Her weight was 217 pounds. (<u>Id.</u> at 295.)

A few days later, Plaintiff consulted a physician with SLUCare about her diabetes. (<u>Id.</u> at 179-80.) She reported that her blurred vision improved when she was taking insulin. (<u>Id.</u> at 179.) She was taking 250 milligrams of Glucophage twice a day. (<u>Id.</u>) It was recommended that she see a dietician, she increase her exercise, and she decrease her weight. (<u>Id.</u> at 180.) It was also recommended that she stop smoking. (<u>Id.</u>)

On October 5, Plaintiff consulted a physician with SLUCare for her diabetes. (<u>Id.</u> at 175-78, 290-92.) On examination it was noted that she had no hernias although she did have obese striae. (<u>Id.</u> at 175.) She had been on Glucophage for one year – 500 milligrams with breakfast and lunch and 250 milligrams with supper – and insulin before that. (<u>Id.</u>) She did

---

[8]Blood sugar levels higher than 200 are to be avoided. <u>Merck Manual</u> at 1112.

not have any numbness in her feet but did in her fingers. (Id.) She had blurred vision in her left outer quadrant. (Id.) Her appearance was within normal limits, with the exception of central obesity. (Id.) She weighed 216 pounds. (Id.) She was advised to stop smoking; she had decreased her smoking from two to two and one-half packs of cigarettes a day to one and one-half packs. (Id. at 177.) She did yoga three times a week for thirty to forty-five minutes. (Id.) Her estimated daily caloric intake was 2,000. (Id.)

Plaintiff reported to Dr. Shishodia on November 12 that she had been going to an endocrinologist, her medications had been changed, and she felt much better. (Id. at 288-89.) Although she had not been having any problems with her diabetes, her blood pressure had been a bit low. (Id. at 288.) She had not been taking her blood pressure medication and had noticed that she was tired and sleepy when driving back home. (Id.) She was to follow-up in four months. (Id. at 289.)

On November 17, Plaintiff went to the emergency room at Parkland Health Center with complaints of severe pain in the right side of her neck and right shoulder and with some pain above her right ankle after being involved in a rear-end automobile accident. (Id. at 196-97.) The diagnosis was whiplash. (Id. at 198, 285.) An x-ray of her cervical spine was normal. (Id. at 198.) She was given a soft collar and prescriptions for Darvocet and Norflex. (Id.) The examining physician, Dana R. Day, M.D., released her to return to work on November 23 without restrictions. (Id. at 285.)

When Dr. Shishodia saw Plaintiff two days later, however, he released her to return to light duty with no lifting on November 24 and to full duty on November 29. (Id. at 284.)

In response to Plaintiff's complaints of severe pain in her neck and entire right side, he had a CT scan performed of her cervical spine; there was no evidence of acute fracture or dislocation.  (<u>Id.</u> at 280, 282.)  There was evidence of mild neural foraminal stenosis of C4 on the right secondary to osteophytes.  (<u>Id.</u>)  On December 3, Dr. Shishodia wrote another note that Plaintiff was to continue on light duty through December 17.  (<u>Id.</u> at 278.)  A physical therapy evaluation on December 6 described Plaintiff as being independent in her activities of daily living before the accident.  (<u>Id.</u> at 276.)  She had a limited range of movement in her cervical spine with pain on the right side of her neck.  (<u>Id.</u>)  Plaintiff reported having neck and back pain, right shoulder pain, and headaches after the accident.  (<u>Id.</u>)  Her functional mobility was described as being within normal limits.  (<u>Id.</u> at 277.)  She walked without an assistive device.  (<u>Id.</u>)  A treatment program was developed.  (<u>Id.</u>)  It was to last three to four weeks, two or three times a week.  (<u>Id.</u>)  The therapist opined that Plaintiff had a "good potential for regaining full functional level without increased pain."  (<u>Id.</u>)

Plaintiff went to the emergency room at Madison Medical Center on February 2, 2000, complaining of being dizzy and light-headed for two to three weeks.  (<u>Id.</u> at 274.)

Plaintiff saw Dr. Shishodia on February 28 for complaints of chest congestion, bilateral earaches, and pain in her left heel.  (<u>Id.</u> at 270.)  The pain went to her knee and hip whenever she walked.  (<u>Id.</u>)  On examination, her ears were normal, and she was prescribed antibiotics for bronchitis.  (<u>Id.</u>)  An x-ray of her left heel revealed a calcaneal spur.  (<u>Id.</u> at 272.)  Her weight was 231 pounds.  (<u>Id.</u> at 271.)  The next day, Plaintiff had a steroid

injection in her heel[9] to relieve pain.  (Id. at 268.)  If she did not have complete relief, she was to contact Dr. Shishodia and have a repeat injection in one week.  (Id. at 268.)

Plaintiff next consulted Dr. Shishodia on April 11 about her head and chest congestion and a productive cough.  (Id. at 267.)  She was given an antibiotic and cough medication and told to follow-up as needed.  (Id.)  Six days later she reported that her cough was worse.  (Id. at 266.)  She was given new medications and advised to be off work for three days to rest.  (Id.)

Her cough not having resolved, Plaintiff was admitted on April 20 to the hospital with acute chronic obstructive pulmonary disease ("COPD") exacerbation and severe bronchitis.  (Id. at 256-62, 264.)  Four problems were identified on discharge two days later:  (1) the COPD, which had responded well to medication; (2) severe bronchitis, which was being treated with antibiotics; (3) the diabetes, which was controlled during the hospitalization with sliding scale insulin; and (4) hypertension, which had responded to medication.  (Id. at 254.)  Plaintiff was placed on an 1,800 calorie diet.  (Id.)

At a follow-up visit, Dr. Shishodia cautioned Plaintiff about taking her blood pressure medication – she had not taken it that day – and stopping smoking.  (Id. at 251.)  He told her to stop smoking within one week.  (Id.)  Her bronchitis had resolved; however, she had severe muscle spasms in her abdomen.  (Id.)  She was given medication for that.  (Id.)

---

[9]The record of the injection identifies the heel as being the right one.  The permission form and the earlier record identify the heel as being the left one.

On July 15, Plaintiff went to the emergency room with complaints of high blood sugar and pain in her legs, hands, and neck.  (Id. at 249-50.)  She was instructed to increase her potassium intake and to follow up with her doctor.  (Id. at 250.)  Consequently, she consulted Dr. Shishodia and was told to continue taking her medication and to use insulin on a sliding scale depending on her blood sugar levels.  (Id. at 243-47.)  If her blood sugar levels remained high, she was to call him.  (Id. at 243.)

At a July 31 visit, Plaintiff's blood sugar level were in the high range of 300 to 350. (Id. at 238-41.)  She reported feeling better when she used insulin, which she had to use frequently.  (Id. at 239.)  She also reported being compliant with her medications and diet. (Id.)  She weighed 230 pounds.  (Id.)  One medication, Glucotrol, was discontinued and another, Glucophage, was continued.  (Id.)  The next month, on August 31, Plaintiff again consulted Dr. Shishodia about her high blood sugar levels.  (Id. at 237-38.)  He noted that she complained at every visit of stress at work.  (Id. at 237.)  She was not sleeping well and usually slept for only two hours a night.  (Id.)  Dr. Shishodia prescribed Sonata for her insomnia but asked that she use it only once or twice a week.  (Id.)  He also wrote a note that stress in Plaintiff's job was leading to her illnesses.  (Id. at 236.)  She was advised to change jobs.  (Id.)

Plaintiff went to the emergency room on September 10 with complaints of high blood sugar.  (Id. at 235.)  She was not taking insulin as directed but was taking it every time her blood sugar levels were high.  (Id.)  She was discharged with instructions to take the insulin as directed and not at other times.  (Id.)  On September 29, Plaintiff reported to Dr. Shishodia

that she was still at her job, had not been able to find another, and was still stressed.  (Id. at 230, 232-34.)  Her blood pressure averaged 300.  (Id. at 232.)  She had been compliant with the medication but had not been able to lose weight, although she tried to maintain a diet.  (Id.)  Her weight was 222 pounds.  (Id.)  Her right hip hurt due to arthritis.  (Id. at 230, 232,)  The pain caused her difficulties walking but not resting.  (Id. at 232.)  She was given Aleve, and her prescription for Sonata for her insomnia was renewed.  (Id.)  She was to follow up in two months.  (Id.)

On November 27, Plaintiff went to the emergency room.  (Id. at 229.)  In addition to complaints of aching joints, her blood sugar level was 556[10] that morning.  (Id.)  She had not had breakfast.  (Id.)  She had had a cough and cold for the last week.  (Id.)  Plaintiff consulted Dr. Shishodia the next day.  (Id. at 226.)  She reported that her blood sugar levels had been running high, in the 300 to 400 range, and that they were much better when she was not working.  (Id.)  She had been trying to maintain a diet, although she had not lost any weight and weighed 222 pounds.  (Id.)  She also complained of a right earache.  Dr. Shishodia reassured her that she did not have one and started her on Humulin for her "uncontrolled" non-insulin dependent diabetes.  (Id.)

At a follow-up visit the next month, Plaintiff felt better "overall."  (Id. at 223.)  She had, however, a head cold, productive cough, and chest congestion.  (Id.)  She did not have any shortness of breath or chest pain.  (Id.)  Her Humulin dosage was increased and she was

_____

[10]See note 8, supra.

to continue taking Glucophage.  (<u>Id.</u>)  Additionally, she was started on antibiotics for bronchitis.  (<u>Id.</u>)  She was to see Dr. Shishodia again in two months.  (<u>Id.</u>)

One week later, on January 4, 2001, Plaintiff complained that she was not feeling any better, was still short of breath and coughing.  (<u>Id.</u> at 220.)  Her blood sugar levels were better.  (<u>Id.</u>)  Noting that Plaintiff had had resistant bronchitis in the past, Dr. Shishodia requested a chest x-ray and prescribed different antibiotics.  (<u>Id.</u>)  He cautioned her that if her symptoms did not get better, she might have to be admitted for intravenous antibiotics.  (<u>Id.</u>)  The chest x-ray showed mild pneumonia in her lower right lobe.  (<u>Id.</u> at 221.)

Two weeks later, Plaintiff went to the hospital with complaints of feeling "very weak," short of breath, and having a persistent cough.  (<u>Id.</u> at 212-13, 215-18.)  Antibiotics had not been helpful.  (<u>Id.</u> at 212, 215.)  She reported that she had no energy and did not think she could work.  (<u>Id.</u>)  She wanted to be admitted.  (<u>Id.</u>)  She was discharged the next day with a diagnosis of right lower lobe pneumonia, diabetes mellitus, and congestive heart failure.  (<u>Id.</u> at 211.)

Plaintiff consulted Dr. Shishodia on February 27.  (<u>Id.</u> at 210, 214.)  She reported that her blood sugar levels had been "remarkably" good after her discharge but recently were in the 200-300 range.  (<u>Id.</u> at 210.)  She had been feeling very depressed; she had never before been on anti-depressants.  (<u>Id.</u>)  She had no complaints of chest pain,  Dr. Shishodia continued Plaintiff on Glucophage and instructed her to closely monitor her blood sugar levels and to strictly control her diet.  (<u>Id.</u>)  He also spoke with her about the various causes of depression and referred her to counseling.  (<u>Id.</u>)

On March 28, Plaintiff complained of a cough. (Id. at 201, 209.) She was given antibiotics for acute bronchitis and instructed to monitor her blood sugar levels more closely. (Id.)

Plaintiff went to the Parkland Health Center emergency room on June 9 after having a mild diabetic reaction caused by a one-hour delay in taking insulin. (Id. at 191-95.) Also, she had had a cough for one week. (Id. at 194.) She was discharged two hours later feeling "much better." (Id. at 195.) On admission, her recent blood sugar reading had been greater than 400; on discharge, it was 213. (Id. at 191, 193.)

Plaintiff went to the emergency room at the Madison Medical Center on June 28. (Id. at 205, 208.) She ached all over because of her bronchitis. (Id. at 208.) And, her right arm and leg hurt as they did when her blood sugar was up. (Id.) Her glucose level was abnormally high at 279. (Id. at 205.) After being treated, she was instructed to follow up with her primary care physician the next day. (Id. at 208.) Consequently, she consulted Dr. Shishodia the next day about her earaches and dizziness. (Id. at 201, 203.) Her weight was 231 pounds. (Id.) She was diagnosed with otitis media and given a note that she was unable to return to work until July 4. (Id. at 201-02, 207.) She was also given different antibiotics for her earaches and a prescription for "some sliding scale regular insulin" to use when her blood sugar was high. (Id. at 203.) She was to follow up in two months. (Id.)

Plaintiff telephoned on July 30 to report that her blood sugar was higher than 500. (Id. at 201.) She had eaten sausage, cereal with milk, peaches, and toast. (Id.) She was instructed to decrease her food intake. (Id.) She called later to report that her blood was

close to 600 and she wanted to be admitted to the Diabetic Clinic at Barnes Hospital. (Id.)
When told her stomach pains were probably not related to her diabetes, she became upset
and hung up. (Id.) Plaintiff called back to get a referral. (Id. at 200.) Someone referred to
as the "employers [sic] nurse" reported that Plaintiff had come in complaining of being sick
and had gone home. (Id.) Plaintiff called later that day to report she was going to the
emergency room. (Id.) Two days later, she called to have her medical records transferred
to a doctor in St. Louis. (Id.)

On August 3, she did consult a doctor in St. Louis, Christopher Maret, M.D., with the
BJC Medical Group. (Id. at 404-12.) She informed him that her blood sugar levels had
frequently averaged between 200 and 400 the past month. (Id. at 408.) She was tired and
depressed and seeing a psychiatrist who was not helping her very much. (Id.) She had been
hospitalized a few years ago when she was suicidal. (Id.) She had occasional pain in her
neck and shoulders and took Aleve. (Id.) Although she wore dentures, the bottom ones did
not fit so she did not wear them. (Id.) She had smoked two packs of cigarettes a day for 35
years. (Id. at 409.) Dr. Maret concluded that she should follow up with a diabetes educator
with a goal of decreasing her insulin and increasing Novolin on a sliding scale. (Id.) He
described her edema as "[w]ell controlled" and her depression as "[f]airly well controlled."
(Id.) He started her on a trial run of Nortriptyline for her chronic pain. (Id.) She was to
follow-up in one month and as needed. (Id.)

At Dr. Maret's request, Plaintiff saw an endocrinologist, Richard E. Ostlund, M.D.,
about her diabetes. (Id. at 464.) She reported that she was following a diabetic diet and

exercised daily. (Id.) She was switched to insulin and continued on Glucophage. (Id.) She was to check her blood sugar levels before driving and four times daily and was to return for a follow-up in three months. (Id.)

At the follow-up visit to Dr. Maret on September 10, Plaintiff's diabetes was "much better." (Id. at 402.) She had not worked since she had last seen Dr. Maret and had no intention of returning to her current job. (Id.) Dr. Maret told her not to return to that job. (Id.) She felt worthless and useless at times but was doing better on Celexa. (Id.) She and her psychiatrist were working well together. (Id.) She wanted to see a podiatrist. (Id.)

Dr. Maret referred Plaintiff to an orthopaedist for her complaints of pain in her low back, right buttock and hip, calves, and feet. (Id. at 457-63.) She informed him she had been having increased difficulties with increased activity and was having difficulty lying on her right hip. (Id. at 460.) On examination, Plaintiff walked with a normal gait but had a limited range of movement in her hip. (Id.) X-rays of both hips and her lumbar spine had shown "very minimal" osteoarthritis in her right hip and degenerative changes at the L5-S1 level. (Id.) The impression was of lumbar spine disease, possible radiculopathy; right hip trochanteric bursitis; and early osteoarthritis in her right hip. (Id.) The recommendation was physical therapy followed by a referral in a few months to Heidi Prather, D.O. (Id.)

Plaintiff returned to Dr. Maret on October 22. (Id. at 400-01.) She was doing well on the Celexa, but her psychiatrist was retiring and she needed to find another. (Id. at 400.) She was not working, spent time at her farm, and walked a lot with her dog. (Id.) She had had low back pain for a few weeks and was not taking any medication for it. (Id.) Her

diabetes and hypertension were better controlled. (Id. at 400, 401.) Her depression was well controlled. (Id. at 401.) On examination, her motor, sensory, and reflex testing were within normal limits. (Id. at 400.) Her straight leg raising was negative. (Id.) She was to follow up with physical therapy for her hip pain and with general surgery for her abdominal pain. (Id. at 401.)

On October 23, Plaintiff consulted a podiatrist, Allen M. Jacobs, D.P.M., on the recommendation of Dr. Maret. (Id. at 335-37.) On examination, Plaintiff had left and right chronic venous insufficiency, a history of paraesthesias and dysesthesias in both feet, an evolving loss of sensory function, and Achilles tendinitis in both feet. (Id. at 33-37.) She was counseled on shoe selection, care and monitoring of her feet, neuropathy, and vascular disease. (Id. at 337.) Dr. Jacobs opined that regressive therapy was not required at that time. (Id.)

On October 30, Plaintiff consulted Dr. Maret about her elevated blood sugar that morning. (Id. at 399.) She had not eaten or taken insulin that morning. (Id.) She weighed 276 pounds and was in no apparent distress. (Id.) She was to increase her dosage of Glucophage and call in three days with her blood sugar readings. (Id.)

Plaintiff consulted Dr. Prather on November 26. (Id. at 453-56.) Plaintiff reported that she had participated in physical therapy after a motor vehicle accident two years before; however, she had not participated since then. (Id. at 454.) On examination, Plaintiff had pain at the end range of lumbar flexion and a hip range of motion within functional limits, although she only had 20 degrees of internal rotation compared to 40 degrees of external

rotation and of abduction. (Id. at 455.) Her cervical spine range of motion was also within functional limits and was not painful, with the exception of end range extension. (Id.) The diagnosis was of low back pain with right lower extremity pain consistent with radiculopathy and axial neck pain. (Id.) After Dr. Prather discussed with Plaintiff her various options, Plaintiff wanted to pick the order in which her conditions would be treated, with the most problematic being the first. (Id.) Plaintiff chose her lumbar spine; consequently, a magnetic resonance imaging ("MRI") and x-rays would be scheduled. (Id. at 455-56.) The MRI revealed normal lumbar vertebral alignment and intervertebral disc spaces. (Id. at 449.) The x-rays revealed a normal cervical spine. (Id. at 448.)

As of her next visit to Dr. Maret, on December 3, Plaintiff had yet to see a psychiatrist. (Id. at 397.) She had an appointment with one the next week. (Id.) She had seen a surgeon about her abdominal hernia. (Id.) The surgeon had wanted to do surgery but after Plaintiff had stopped smoking and had lost weight. (Id.) She had occasional neck and back pain and had seen a spine specialist the last week. (Id.) Her edema was well controlled. (Id.)

Plaintiff returned to the endocrinologist, Dr. Ostlund, on December 13. (Id. at 447.) He noted, "patient is taking a complicated regimen and has poor control of the blood glucose. She has cut down on smoking from 2 [packs per day] to 1 [packs per day] and has gained 10 lbs. . . . The patient is on a complex insulin regimen that is often not needed in type 2 diabetes." (Id.) He asked her to take only a specific type of insulin, noting that most type 2 diabetics could achieve excellent results on that type. (Id.)

Plaintiff saw Dr. Maret again on December 17 and on January 7, 2002. (Id. at 391-94.) At the later visit, she reported that she had cut back significantly on smoking because the surgeon would not operate on her hernia until she did so. (Id. at 391.) Her back pain was better, but she still had an appointment at the spine center. (Id.) Her occasional back and hip pain persisted. (Id.)

On January 22, Plaintiff returned to see Dr. Prather. (Id. at 434-46.) Motor and sensory nerve conduction studies were normal. (Id. at 434-35.) There was no electrodiagnostic evidence of peripheral neuropathy or radiculopathy; there was, however, electrodiagnostic evidence of compression of the median nerve at her wrist. (Id. at 435.) Dr. Prather ordered physical therapy for Plaintiff. (Id.)

Plaintiff reported to Dr. Maret on February 4 that she had undergone nerve conduction velocity ("NCV") testing and had been told she had carpal tunnel syndrome with occasional numbness in her hands. (Id. at 388.) He questioned the diagnosis of carpal tunnel syndrome because her Tinel's sign was negative. (Id. at 389.) She continued to smoke one pack of cigarettes a day and was strongly encouraged to stop. (Id.) She was also encouraged not to nap during the day. (Id.)

Plaintiff was described in the notes of her March 4 visit to Dr. Maret as "chronically anxious." (Id. at 385.) She had been under a lot of stress and had not been eating right. (Id.) She had been thinking of selling her farm and was concerned about what her children would do. (Id.) She weighed 234 pounds. (Id.) Shots had "somewhat" helped the numbness in her hands and low back pain. (Id.) She was to increase her insulin and to follow-up with an

endocrinologist and was also to follow-up with the spine center for her carpal tunnel syndrome. (<u>Id.</u> at 386.) She was to take Tylenol and use heat for her back pain. (<u>Id.</u>) One month later, Plaintiff's depression was "much improved." (<u>Id.</u> at 380.) She continued to have some occasional aches and pains in her low back and in her right shoulder; medication helped. (<u>Id.</u>) She had had a recent episode of "'fainting'"; consequently, an MRI and cartoid ultrasound were scheduled to rule out a TIA. (<u>Id.</u> at 381.) The MRI showed nothing active and no evidence of a recent infarction. (<u>Id.</u> at 377.) There was, however, evidence of a possible old lacunar infarction. (<u>Id.</u>)

When Plaintiff next saw Dr. Prather, in April, she had not been to physical therapy. (<u>Id.</u> at 428-29.) She was to begin physical therapy. (<u>Id.</u> at 428.) Other treatment would wait until she had completed a workup with Dr. Maret. (<u>Id.</u>)

At her next, May 21 visit to Dr. Maret, Plaintiff's diabetes and hypertension were both controlled by medication. (<u>Id.</u> at 375.) Her mental condition was "[v]ery stable"; she no longer wished to consult a psychiatrist because "'all he does is push pills.'" (<u>Id.</u>) Plaintiff stopped the Celexa for her depression and reported at her follow-up visit in June that her mood was stable. (<u>Id.</u> at 373.) Her back pain was improved; she was not taking any medication for it. (<u>Id.</u>) Her diabetes and hypertension continued to be controlled by medication. (<u>Id.</u>) She was smoking less and was being more physically active. (<u>Id.</u>) Dr. Maret instructed her to continue to increase her exercise to control her smoking and her weight. (<u>Id.</u> at 374.)

Plaintiff returned to Dr. Maret on August 19 with complaints of occasional right hip pain with "a lot of physical activity." (Id. at 369.) Physical activity lowered her blood sugars, which were generally in the target range. (Id.) She had shortness of breath on exertion. (Id.) She had persistent neck and hand pain, "but no regular functional disability." (Id.) She "[s]ometimes [felt] like 'life is not worth living,'" had no suicidal ideation, and did not like her counselor. (Id.) She was advised to consult a new psychiatrist, watch her diet, and continue to try to stop smoking. (Id. at 370.)

She reported at her next, October 14 visit that she had seen a new psychiatrist and was taking Topamax and Celexa. (Id. at 365.) Her back, hip, and knee pain was worse, especially when she was on her feet. (Id.) She was to return to the spine center. (Id.) She refused a referral for her abdominal hernia. (Id. at 366.)

Plaintiff returned to Dr. Prather in December,[11] complaining of wrist and hand numbness. (Id. at 425-26.) She was referred to a Dr. Boyer. (Id. at 426.)

When Plaintiff next saw Dr. Maret, in January 2003, her hypertension was borderline high and she was continued on her medication; her bronchitis was resolved; her mental condition was stable. (Id. at 547-48.) Her weight was 235 pounds; he told her to get serious about her diet. (Id. at 547.) She was still smoking and was again encouraged to completely stop. (Id.) Dr. Maret's notes of her February visit indicate that Plaintiff was "[s]till" smoking cigars, ten each day. (Id. at 545-46.) Her low back pain was stable; her abdominal

---

[11]Plaintiff also saw Dr. Prather in November 2002. (Id. at 427.) Only one paragraph of the notes of that visit are in the record.

pain was resolved. (Id. at 546.) Plaintiff's February visit to Dr. Maret was unremarkable; however, the next month Plaintiff reported that she was feeling well and was again playing the guitar. (Id. at 542-44.) At Plaintiff's next visit, in May, she told Dr. Maret that she needed a new psychiatrist and was not working well with her current one. (Id. at 540.) She was tapering off smoking. (Id.) Her weight was down five pounds, to 229 pounds. (Id.) He told her to get serious about her diet. (Id.)

Plaintiff did not return to Dr. Maret until November, when she told him that she had run out of her medication a couple of months before because she had run out of money. (Id. at 538.) Her weight was 241 pounds. (Id.) Dr. Maret asked at the next visit, two weeks later, that Plaintiff get serious about her diet. (Id. at 537.) Her hip pain was improved and she was prescribed antibiotics and told to stop smoking for her bronchitis. (Id.) Her husband was described as "supportive." (Id. at 536.) In January 2004, Plaintiff weighed 241.5 pounds. (Id. at 535.) Her blood sugars were a "little high" and she had not been following her diet recently. (Id.)

As noted above, Dr. Prather referred Plaintiff to Dr. Boyer. Dr. Boyer performed right and left carpal tunnel release surgery in February 2003. (Id. at 570-71.) Two months later, she was "100% better" and was playing the guitar. (Id. at 568.)

In addition to seeking medical care for her physical ailments, Plaintiff sought mental health treatment.

Beginning on March 22, 2001, Plaintiff went to the Community Counseling Center. (Id. at 349-53.) She smoked one and one-half to two packs of cigarettes a day and consumed

at least six caffeinated drinks each day.  (Id. at 349.)  With the exception of a brief inpatient treatment for post partum depression when she was 23, Plaintiff had had "very little in the way of any psychiatric problems."  (Id.)  She thought her trouble with depression probably began at the beginning of the year, although it might have started earlier but she had failed to recognize it.  (Id.)  She attributed the increase in her stress level to a new director at work the past three years.  (Id.)  Her depression manifested itself by crying, fatigue, trouble sleeping, irritability, and decreased concentration.  (Id.)  Her interests and motivation appeared to be intact.  (Id.)  Plaintiff had had trouble with obesity since childhood and then weighed 238 pounds.  (Id. at 350.)  Her diabetes was unstable; her hypertension was not and did not require medication.  (Id.)  She was diagnosed with mood disorder due to diabetes mellitus and assessed a current GAF of 70.[12]  (Id. at 351.)  She was also given a prescription for Celexa and was told to return for psychiatric reassessment in four weeks.  (Id.)

Four weeks later, Plaintiff reported that she was not as tired although she was not sleeping well because she was not getting to bed until 10 o'clock in the evening and was waking up at 4:30 in the morning.  (Id. at 353.)  She had abnormal snoring and no new psychiatric complaints.  (Id.)  In May, Plaintiff's mental status examination was better.  (Id. at 345.)  Her blood sugar levels were better – they were generally around 200 – but she still had the same problems at work and was looking for a different job.  (Id.)  She was given

---

[12]A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  Manual at 34.

samples of Celexa and told to return in two months. (<u>Id.</u>) Plaintiff did return; however, on mental status examination she was described as "not good." (<u>Id.</u> at 344.) She was angry with a supervisor who had given her a hard time about her illness. (<u>Id.</u>) Her blood sugar levels were around 400. (<u>Id.</u>) Her diagnosis was the same; her dosage of Celexa was increased. (<u>Id.</u>) She was to return in two months, but returned in one after having to leave work the day before because of trouble with her supervisor. (<u>Id.</u> at 343-44.) Her blood sugar levels were around 600. (<u>Id.</u> at 343.) She was better after leaving work but was not well enough to return. (<u>Id.</u>) She was to speak with a lawyer on Friday about a disability discrimination complaint. (<u>Id.</u>) She was to continue on the Celexa but a tranquilizer might need to be added. (<u>Id.</u>) Two weeks later, Plaintiff reportedly was doing better and had no new psychiatric complaints. (<u>Id.</u> at 341-42.) She had been on sick leave from work. (<u>Id.</u> at 341.) The Celexa prescription was renewed and she was to return in four weeks. (<u>Id.</u>) When Plaintiff did so, on September 17,[13] she reported that her daughters and their husbands were living at home and her son had a broken leg and was unable to work. (<u>Id.</u> at 340.) She was unable to work because of her medical problems. (<u>Id.</u>) The financial problems were stressful. (<u>Id.</u>) Her mood was depressed; her affect was normal. (<u>Id.</u>) She had no suicidal or homicidal ideation and no psychosis. (<u>Id.</u>) She was given samples of Celexa and was to continue on her current treatment plan. (<u>Id.</u>)

---

[13]The notes of the prior visits had been entered by Peter S Moran, D.O., a psychiatrist. It is unclear from the record who Plaintiff saw on September 17; it apparently was not Dr. Moran.

As noted in the records of Dr. Maret, Plaintiff sought a different counselor in August 2002 and went to the Center for Creative Change. (Id. at 413-16.) She reported that she had been depressed since April 2001. (Id. at 414.) Although she had suicidal ideation, she denied that she would act on such. (Id.) Her husband was negative; it was suggested she wear earplugs to avoid listening to him. (Id.) Plaintiff complained of her husband's negativity at the September and October 2 visits. (Id.) At the last, October 10 visit, she revealed that she had not been truthful about her husband. (Id.) He was not the problem; not working and a woman named Cheryl Graham were the problem. (Id.) She was encouraged to "look for good" in not working and not think about Cheryl. (Id.)

Plaintiff went to a different center, the Southeast Missouri Community Treatment Center, the next month, explaining that her psychiatrist had retired. (Id. at 421-23.) She had been diagnosed with depression and was taking Celexa. (Id. at 422.) She reported that her diabetes was not well controlled. (Id.) On examination, she was alert and oriented to time, place, and person, was pleasant, and had good insight. (Id. at 423.) The diagnosis was major depression, recurrent; her GAF was 65.[14] (Id.) Her Celexa was increased. (Id. at 421.) In January, Plaintiff reported that her blood sugars were getting better. (Id.) She was continued on Celexa. (Id.) Plaintiff next saw the counselor in March. (Id. at 420.) Her affect was pleasant; she had no suicidal ideation. (Id.) She was continued on the Celexa and was prescribed Topamax. (Id.) She was to return for a follow-up visit in two months, but did not show. (Id.) She did return five months later, in October, and was seen by R.A.

---

[14]See note 12, supra.

Mallya, M.D. (Id. at 419.) She had not had the prescription for Topamax filled. (Id.) Her mood was depressed; she was "somewhat anxious." (Id.) She was oriented to time, place, and person, had average intelligence, and fair judgment and insight. (Id.) She was to continue the Celexa and start the Topamax. (Id.) The next month, Plaintiff reported that she could not tolerate the side effects from the Topamax so she stopped it. (Id. at 418.) She needed to have hernia surgery but was afraid of complications. (Id.) She did not appear for her December appointment. (Id. at 561.) In June 2003 she was discharged from treatment for non-compliance. (Id. at 560.)

In addition to the records of Plaintiff's medical treatment, the ALJ had before him a psychological evaluation performed by a consulting examiner and assessments of Plaintiff's ability to function, mentally and physically, completed by agency experts and by her health care providers and evaluations.

Kenneth G. Mayfield, a licensed psychologist, evaluated Plaintiff in April 2002. (Id. at 359-61.) She reported that her daily activities were restricted by her health problems and that her husband and son had assumed many domestic chores. (Id. at 360.) On examination, she was coherent, relevant, generally logical, anxious, depressed, and had lowered self-esteem. (Id.) She did not appear to be delusional or suicidal and displayed no evidence of a thought disorder or psychosis. (Id.) She was oriented to time, place, and person, and her capacity for sustained concentration and attention did not appear to be markedly impaired. (Id.) Her recall of recent activities "proved rather spotty." (Id.) The diagnosis was of mood

disorder due to multiple health problems; her GAF was 70. (Id. at 361.) The evaluation concluded with the following assessment:

> Current level of daily functioning reveals the client's ability to relate to others is intact. There are, however, indications of increasing social isolation and constriction of interests and habits. She is able to care for basic personal needs. She is able to understand and follow directions, but appears unemployable at present time. She is otherwise capable of comprehending and following basic personal and financial affairs.

(Id.) Asked about the apparent conflict between being able to follow directions and being unemployable, the psychologist explained that he meant to say that Plaintiff might have problems working due to her multiple physical problems but her mental problems were not markedly limiting. (Id. at 357.) Consequently, he amended the last two sentences to read: "She is able to understand and follow directions. Ability to cope with stress and pressures of routine work activities appears questionable due to health problems and secondary depression." (Id. at 355.)

Marsha J. Toll, Psy. D., completed a Mental Residual Functional Capacity Assessment of Plaintiff in January 2003. (Id. at 474-76.) Of twenty listed mental activities, Plaintiff was rated as "moderately limited" in four: her ability to understand and remember detailed instructions; her ability to carry out detailed instructions; her ability to maintain attention and concentration for extended periods; and her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. (Id. at 474-75.) She was not significantly limited by her affective disorder in the remaining sixteen activities. (Id.) Dr. Toll also completed a Psychiatric Review Technique form for

Plaintiff rating the impact of her affective disorder – depression – on her functional capacity. (Id. at 478-91.)  Dr. Toll concluded that the degree of limitation caused by Plaintiff's disorder on her activities of daily living and her ability to maintain social functioning was mild.  (Id. at 488.)   The disorder caused her moderate difficulties in maintaining concentration, persistence, and pace.  (Id.)  She had no repeated episodes of decompensation of any duration.  (Id.)

The same month Dr. Toll completed her assessments, Donald Edwards, M.D., completed a Physical Residual Functional Capacity Assessment of Plaintiff.  (Id. at 492-501.)  He listed her primary diagnosis as carpal tunnel syndrome and secondary diagnosis as diabetes, ventral hernia, neuropathy, and arthritis.  (Id. at 492.)  He opined that she could occasionally lift 50 pounds, frequently lift 25 pounds, and sit, stand, or walk about 6 hours in an 8-hour workday.  (Id. at 493.)  She had no postural, manipulative, visual, environmental, or communicative limitations.  (Id. at 495-97.)

In January 2004, Dr. Maret completed a diabetes mellitus residual functional capacity questionnaire submitted by Plaintiff's representative.  (Id. at 554-55.)  He responded that her impairments were "reasonably consistent" with her symptoms and functional limitations and that her experience of those symptoms were often severe enough to interfere with her attention and concentration.  (Id. at 554.)  She had a severe limitation in her ability to deal with work stress because she had limited resources with which to cope with such stress.  (Id. at 555.)  She would need a job which permitted her to shift positions at will, but could not

work in even a sedentary position.  (Id.)  She had only bad days.  (Id.)  He opined that she was totally and permanently disabled.  (Id.)

Lynn James, a licensed psychological counselor with the Center for Creative Change, also completed a questionnaire in January 2004 submitted by Plaintiff's representative.  (Id. at 556-57.)  She had treated Plaintiff four times, between August 28, 2002, and October 16, 2002.[15]  (Id. at 556.)  Plaintiff's current GAF and the highest during the past year was 63.[16] (Id.)  Stressors included the loss of her job and her marital relationship.  (Id.)  Her prognosis was poor, and her impairments were expected to last at least 12 months.  (Id. at 557.)  Those impairments were also expected to cause Plaintiff to be absent from work at least three times each month.  (Id.)  And, they resulted in (a) extreme limitations in her activities of daily living and in maintaining social functioning, (b) frequent deficiencies in concentration, persistence, and pace, and (c) frequent episodes of deterioration or decompensation.  (Id.)

On January 20, 2004, Dr. M. Asif Qaisrani with the Community Counseling Center wrote that Plaintiff's "current psychiatric condition precludes her from sustaining gainful employment."  (Id. at 576.)  In May, he completed a questionnaire identical to that completed by Ms. James.  (Id. at 574-75.)  He assessed Plaintiff's current GAF at 58 and her highest during the past year at 60.[17]  (Id. at 574.)  He opined that Plaintiff might not be able to "attain

_____

[15]As noted by the Commissioner, Ms. James mistakenly lists "2003" as the year in which she counseled Plaintiff.  The year was actually 2002.

[16]See note 12, supra.

[17]See note 6, supra.

or sustain gainful employment." (<u>Id.</u> at 575.) Long term care would be needed for her to sustain social functioning, and her impairments were expected to last at least 12 months. (<u>Id.</u>) Those impairments resulted (a) in slight limitations in her activities of daily living; (b) in moderate limitations in maintaining social functioning, (c) often in deficiencies in concentration, persistence, and pace, and (d) often in episodes of deterioration or decompensation. (<u>Id.</u>)

### The ALJ's Decision

Finding that the medical evidence established that Plaintiff had severe impairments of lumbar spine degenerative disease, obesity ,and depression, the ALJ further found that these impairments were not of listing-level severity. (<u>Id.</u> at 19.) Moreover, her depression resulted in only a mild restriction in her daily living activities and in moderate difficulties in maintaining social functioning, concentration, persistence, and pace. (<u>Id.</u> at 20.) Plaintiff's diabetes and carpal tunnel syndrome did not limit her physical or mental ability to do basic work-related activities. (<u>Id.</u>) In so concluding, the ALJ noted that her diabetes was better and controlled once Plaintiff began treatment with Dr. Maret. (<u>Id.</u>)

Addressing the question of Plaintiff's residual functional capacity ("RFC"), the ALJ determined that the record supported the medical consultant's findings that she could sit for a total of six hours in an eight-hour workday. (<u>Id.</u> at 21.) She also could, as indicated by her GAF scores of 60 and 70, do unskilled work involving simple, repetitive tasks. (<u>Id.</u>) Accordingly, the ALJ found, Plaintiff had the RFC to lift or carry a maximum of ten pounds, sit for a total of approximately six hours in an eight-hour workday; stand or walk for a total

of two hours in an eight-hour workday; and perform simple, repetitive tasks. (Id.) She could

perform unskilled, sedentary work. (Id.) She could not, however, return to her past relevant

work because such work was performed at a higher exertional level than her RFC allowed.

(Id. at 22.)

Applying the Medical-Vocational Guidelines (the "Grid"), Plaintiff's age, education,

vocationally relevant work experience, and RFC allowed her to perform a significant range

of sedentary work. (Id.) Moreover, the VE had testified that there were jobs that existed in

significant numbers in the national and state economy that Plaintiff could perform. (Id. at

23.) She was not, therefore, disabled within the meaning of the Act. (Id.)

### Legal Standards

Under the Social Security Act, the Commissioner shall find a person disabled if the

claimant is "unable to engage in any substantial activity by reason of any medically

determinable physical or mental impairment," which must last for a continuous period of at

least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The

impairment suffered must be "of such severity that [the claimant] is not only unable to do

[her] previous work, but cannot, considering [her] age, education, and work experience,

engage in any other kind of substantial gainful work which exists in the national economy."

42 U.S.C. § 1382c(a)(3)(B) (alterations added).

The Commissioner has established a five-step process for determining whether a

person is disabled. See 20 C.F.R. § 404.1520. See also **Johnson v. Barnhart**, 390 F.3d

1067, 1070 (8th Cir. 2004); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002);

**Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 404.1520(b). Second, the claimant must have a severe impairment. See 20 C.F.R. § 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . ." Id. (alteration added). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 404.1520(d), and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

Additionally, the evaluation during the administrative review process of the severity of a mental impairment in adults must follow the technique set forth in 20 C.F.R. § 416.920a. This technique requires that the claimant's "pertinent symptoms, signs, and laboratory findings" be evaluated to determine whether the claimant has a medically determinable impairment. Id. § 416.920a(b)(1). The degree of functional limitation resulting from this impairment must then be rated. Id. §§ 416.920a(b)(2) and (c). This rating follows

a specific format, identifying four broad functional areas and analyzing the degree of limitation in each area imposed by the mental impairment. Id. §§ 416.920a(c)(3) and (4). The degree of limitation in the first three areas is rated on a five-point scale: "[n]one, mild, moderate, marked, and extreme." Id. § 416.920a(c)(4). The degree of limitation in the fourth area, episodes of decompensation, is rated on a four-point scale: "[n]one, one or two, three, four or more." Id. A rating of "none" or "mild" in the first three categories and "none" in the fourth will generally result in a finding that the mental impairment at issue is not severe. Id. § 416.920a(d)(1). On the other hand, if the mental impairment is severe, the medical findings about that impairment and the resulting limitations in the four functional areas are to be compared "to the criteria for the appropriate listed mental disorder." Id. § 416.920a(d)(2). If the claimant has a severe mental impairment that does not meet or equal the severity of any listing, then the claimant's residual functional capacity is to be assessed. Id. § 416.920a(d)(3). Section 416.920a(e) requires that the application of this technique be documented. An ALJ is to document the application in his or her decision. Id.

At the fourth step in the process, the ALJ "review[s] [claimant's] residual functional capacity and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e) and 416.920(e) (alterations added). "[RFC] is what the claimant is able to do despite limitations caused by all the claimant's impairments." **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (alteration added). "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes

- 35 -

competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)) (alteration added). Moreover, "[RFC] is a determination based upon all the record evidence[,]" not only medical evidence. **Dykes v. Apfel**, 223 F.3d 865, 866-67 (8th Cir. 2000) (alterations added). Some medical evidence must be included in the record to support an ALJ's RFC holding. **Id.** at 867. "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Ramirez**, 292 F.3d at 580-81; **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions." **Ramirez**, 292 F.3d at 581 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted)). Although an ALJ may not disregard subjective complaints of pain based only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary." **Id.** See also **McKinney v. Apfel**, 228 F.3d

860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical evidence regarding a claimant's disability is inconsistent.").  After considering the <u>Polaski</u> factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints.  **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

The burden at step four remains with the claimant.  <u>See</u> **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001); **Singh**, 222 F.3d at 451.  "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC."  **Pearsall**, 274 F.3d at 1217.

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  **Banks**, 258 F.3d at 824.  <u>See also</u> 20 C.F.R. § 404.1520(f).  The Commissioner may meet her burden by eliciting testimony by a vocational expert ("VE").  **Pearsall**, 274 F.3d at 1219.  If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a whole."  **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998); **Frankl**, 47 F.3d at 937.  "Substantial evidence is less than a

preponderance but is enough that a reasonable mind would find it adequate to support the decision." **Strongson v. Barnhart**, 361 F.3d 1066, 1069-70 (8th Cir. 2004) (interim quotations omitted). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into account whatever in the record fairly detracts from that decision. **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998). The court may not reverse that decision merely substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it "might have decided the case differently." **Strongson**, 361 F.3d at 1070. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 244 F.3d 891, 894-95 (8th Cir. 2000) (alteration added).

## Discussion

Plaintiff argues that the ALJ's decision (a) erroneously failed to give the proper weight to the opinions of her treating physicians, Drs. Qaisrani and Maret, regarding the severity of her mental illness and improperly relied instead on the GAF scores and the opinion of the consulting examiner and (b) erroneously ignored Dr. Qaisrani's assessment of her mental residual functional capacity. The Commissioner disagrees.

Both Plaintiff's arguments are premised on the position that the ALJ did not properly evaluate and weigh the opinions of her treating health care providers, Drs. Qaisrani and Maret and Ms. James.

"'The [social security] regulations provide that a treating physician's opinion . . . will be granted 'controlling weight' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" **Holmstrom v. Massanari**, 270 F.3d 715, 720 (8th Cir. 2001) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000)) (alterations in original). Accord **Wilson v. Apfel**, 172 F.3d 539, 542 (8th Cir. 1999); **Chamberlain v. Shalala**, 47 F.3d 1489, 1494 (8th Cir. 1995). See also **Hacker v. Barnhart**, — F.3d — 2006 WL 2456373, *3 (8th Cir. Aug. 25, 2006) ("A treating physician's opinion is generally given controlling weight, but is not inherently entitled to it."). The longer a claimant's physician has treated her and the more times, the more weight is given to that physician's opinion. 20 C.F.R. § 404.1527(d)(2)(i). And, the more knowledge a physician has about the claimant's impairments, the more weight is given to that physician's medical opinion. 20 C.F.R. § 404.1527(d)(2)(ii). "[T]he more consistent an opinion is with the record as a whole, the more weight . . . will [be] give[n] that opinion." 20 C.F.R. § 404.1527(d)(4) (alterations added). Conversely, "[a] treating physician's own inconsistency may also undermine his opinion and diminish or eliminate the weight given his opinions." **Hacker**, 2006 WL 2456373, *3 (alteration added). Thus, the Eighth Circuit Court of Appeals has "allowed an ALJ to substitute the opinions of non-treating physicians in several instances, including where a treating physician 'renders inconsistent opinions that undermine the credibility of such opinions.'" **Id.** (quoting Prosch, 201 F.3d at 1013).

As noted by Plaintiff, Dr. Qaisrani opined in January 2004 that her current psychiatric condition precluded gainful employment. Five months later, he added that her condition was expected to last at least 12 months and imposed functional limitations. Listing 12.04(B) mandates that for affective disorders, e.g., depression, these limitations result in at least two of the following: (1) "[m]arked restriction of activities of daily living"; (2) "[m]arked difficulties in maintaining social functioning"; (3) "[m]arked difficulties in maintaining concentration, persistence, or pace"; and (4) "[r]epeated episodes of decompensation, each of extended duration." 20 C.F.R. Pt. 404, Supt. P, App. 1 (alterations added). Dr. Qaisrani's assessment of Plaintiff's limitations does not satisfy the Listing criteria.

He does opine, however, that she has a psychological impairment lasting at least 12 months and precluding gainful employment. The record is lacking in support for this opinion. The treatment notes from the center with which he is apparently affiliated, the Community Counseling Center, are primarily of Dr. Moran. The only visit when she was not seen by Dr. Moran was in September 2001, at least two years before Dr. Qaisrani wrote his letter. At that visit, Plaintiff complained of stress caused by financial problems created, at least in part, by her daughters and their husbands living with her and her son being out of work. Although her mood was depressed, her affect was normal and she had no suicidal ideation. This possible one-time visit with Dr. Qaisrani does not entitle his conclusory opinion to any greater weight than the evaluation of Dr. Mayfield, who also saw Plaintiff one time. See **Hacker**, 2006 WL 2456373, *5 ("'It is well settled that an ALJ may consider the opinion of an independent medical advisor as one factor in determining the nature and

severity of a claimant's impairment.'" (quoting <u>Harris v. Barnhart</u>, 356 F.3d 926, 931 (8th Cir. 2004)).  After concluding that Dr. Qaisrani's opinion was inconsistent with substantial evidence on the record as a whole, the ALJ was "clearly authorized" to consider Dr. Mayfield's opinion.  **Id.**

Ms. James concluded that Plaintiff's functional limitations created by her depression were of such severity, i.e., extreme limitations in activities of daily living and maintaining social functioning, frequent deficiencies in concentration, persistence, and pace, and frequent episodes of decompensation, that her depression would satisfy Listing 12.04(B).  This conclusion is not entitled to controlling weight.  First, Ms. James is not an acceptable medical source under 20 C.F.R. § 404.1513(a).  Second, Ms. James had treated Plaintiff four times; the last visit was at least two years before the questionnaire was completed.  Of those four sessions, three focused on the negativity of Plaintiff's husband.  Ms. James listed Plaintiff's marital relationship as one of two stressors, the other being the loss of her job.  Plaintiff informed her at the last visit, however, that she had not been truthful about her husband and that he was not a problem.  Indeed, Plaintiff described her husband as supportive two months before Ms. James completed the questionnaire.

Plaintiff also argues that Dr. Maret's opinion that she was totally and permanently disabled was not given the proper weight by the ALJ.  This opinion is inconsistent with Dr. Maret's own records.  Dr. Maret saw Plaintiff on a consistent basis between August 2001 and January 2004.  He also consistently told her to lose weight to help control her diabetes and stop smoking.  She did neither.  "Impairments that are controllable or amenable to treatment

do not support a finding of total disability." **Hutton v. Apfel**, 175 F.3d 651, 655 (8th Cir. 1999). Dr. Maret's office notes indicate that when Plaintiff followed instructions and was compliant with her medication, her diabetes, her hypertension, and her depression were "well controlled." Her neck pain was sporadic and relieved by over-the-counter medication. Carpal tunnel release surgery had helped her hands. At one point, she was "100% better." Although she later complained of returning pain, she did not return to Dr. Boyer as instructed. <u>See</u> **Choate v. Barnhart**, 457 F.3d 865, 872 (8th Cir. 2006) (holding that an ALJ may properly consider a claimant's noncompliance with a treating physician's directions, including to stop smoking and to seek treatment). Additionally, Dr. Maret's treatment notes never include any physical restrictions on Plaintiff, e.g., a lifting restriction. <u>See</u> **Id.** at 870 (finding that ALJ properly discounted medical source statement by physician whose treatment notes never mentioned any suggested restrictions on claimant's ability to sit or stand for any length of time). And, although Dr. Maret concluded that Plaintiff was totally disabled, "[t]he legal determination that an applicant is 'disabled' is for the Commissioner." **Id.** (alteration added).

## Conclusion

The question is not how this Court would decide whether Plaintiff is disabled within the meaning of the Act, but is whether the ALJ's decision that she is not is supported by substantial evidence in the record as a whole, including a consideration of the evidence that detracts from the ALJ's decision. For the reasons discussed above, there is such evidence. Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED

and that this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 12th day of  September, 2006.